**PHILADELPHIA GAS WORKS,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Piedmont Natural Gas Company, Brooklyn Union Gas Company, Washington Gas Light Company, Long Island Lighting Company, Public Service Commission of the State of New York, Consolidated Edison Company of New York, Inc., North Carolina Natural Gas, Transcontinental Gas Pipe Line Corp., Public Service Company of North Carolina, Inc., Carolina Pipeline Company, General Motors Corporation, American Textile Manufacturers Institute, Inc., Gas Section, Georgia Municipal Association, Farmers Chemical Association, Inc., Public Service Electric and Gas Co., South Jersey Gas Com-

pany, Owens-Corning Fiberglas Corporation, Public Service Commission of the State of South Carolina, Columbia Gas Transmission Corporation, City of Danville, Virginia, Atlanta Gas Light Company, Philadelphia Electric Company, Commonwealth Natural Gas Corporation, Delmarva Power & Light Company, Consolidated Gas Supply Corporation, State of North Carolina and North Carolina Utilities Commission, Commissioners of Public Works of Greenwood, South Carolina, Intervenors.

No. 76–1357.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 28, 1977.

Decided May 9, 1977.

Stephen Schachman, Philadelphia, Pa., for petitioner.

Philip R. Telleen, Atty., F.P.C., Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel and Allan Abbot Tuttle, Sol., F.P.C., Washington, D. C., were on the brief, for respondent.

Melvin Richter, Dale A. Wright and Gregory Grady, Washington, D. C., were on the brief, for intervenor, Piedmont Natural Gas Co., Inc.

Joseph P. Stevens, Barbara M. Gunther and Alvin Adelman, Brooklyn, N. Y., were on the brief, for intervenor The Brooklyn Union Gas Co.

William I. Harkaway, Washington, D. C., was on the brief, for intervenor Consolidated Edison Co. of New York, Inc.

Thomas F. Ryan, Jr. and Robert G. Hardy, Washington, D. C., were on the brief for intervenor, Transcontinental Gas Pipe Line Corp.

John E. Holtzinger, Jr. and Paul H. Keck, Washington, D. C., were on the brief, for intervenor, Atlanta Gas Light Co.

Norman A. Flaningam, Washington, D. C., was on the brief for intervenor, Consolidated Gas Supply Corp.

Daryal A. Myse, Washington, D. C., was on the brief for intervenor Gas Section, Georgia Municipal Association. Dean George Hill, Washington, D. C., also entered an appearance for intervenor Gas Section, Georgia Municipal Association. John S. Schmid and Paul W. Fox, Washington, D. C., were on the brief for intervenor Delmarva Power & Light Co.

Edward S. Kirby and James R. Lacey, Newark, N. J., were on the brief, for intervenor Public Service Electric & Gas Company.

Morton L. Simons, Washington, D. C., was on the brief for intervenors State of North Carolina and North Carolina Utilities Commission.

Nathan Kaminski and Robert T. Bockman, Columbia, S. C., were on the brief for intervenor, South Carolina Public Service Commission.

Susan A. Low, Washington, D. C., entered an appearance for intervenor Washington Gas Light Co.

Robert C. Richards, New York City, entered an appearance for intervenor Long Island Lighting Co.

Richard A. Solomon, Washington, D. C., entered an appearance for intervenor The Public Service Commission of the State of New York.

Donald W. McCoy, Fayetteville, N. C., entered an appearance for intervenor North Carolina Natural Gas.

F. Kent Burns, Raleigh, N. C., entered an appearance for intervenor Public Service Company of North Carolina, Inc.

Stanley M. Morley and Robert G. Simon, Washington, D. C., entered an appearance for intervenor Carolina Pipeline Co.

Edward J. Grenier, Jr., Richard P. Noland and Richard J. Pierce, Jr., Washington, D. C., entered appearances for intervenor, General Motors Corp.

Ronald D. Eastman, Washington, D. C., entered an appearance for intervenor, American Textile Manufacturers Institute, Inc.

Stephen A. Herman, Washington, D. C., entered an appearance for intervenor Farmers Chemical Association, Inc.

Raymond D. Hurley, Washington, D.C., entered an appearance for intervenor Owens-Corning Fiberglas Corporation.

Leonard Sargeant, III, John D. Daley and Giles D. H. Snyder, Charleston, W. Va., entered appearances for intervenor Columbia Gas Transmission Corp.

Northcutt Ely, Frederick H. Ritts and Robert F. Pietrowski, Jr., Washington, D. C., entered appearances for intervenor The City of Danville, Virginia.

Eugene J. Bradley, Philadelphia, Pa., entered an appearance for intervenor, Philadelphia Electric Co.

James O. Watts, Jr., Lynchburg, Va., entered an appearance for intervenor Commonwealth Natural Gas Corp.

William B. Patrick, Jr., Greenwood, S. C., entered an appearance for intervenor, Commissioners of Public Works of Greenwood, South Carolina.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case is before us on a petition to review an order of the Federal Power Commission approving an interim curtailment plan for the Transcontinental Gas Pipe Line Corp. (Transco) interstate transmission system for the period from November 16, 1975 to October 31, 1976. The Commission approved an interim settlement agreement (ISA) which was approved by all of Transco's customers except petitioner Philadelphia Gas Works (PGW), a municipally-owned distribution system, and the North Carolina parties who have intervened in this case in support of the FPC. PGW's objections did not persuade the Commission. Although PGW's points are not frivolous,

the heft of the case in its totality persuades us that the Commission's order should be affirmed.

The details of the curtailment plan are available in the Commission's discussion.[1] For present purposes, it suffices to identify several aspects of the case.

■ 1. The first question is the issue of the existence and extent of PGW's aggrievement. In an order of August 18, 1976 this court ordered further proceedings and memoranda on the aggrievement issue. PGW's main complaint with the interim settlement agreement for 1975–76 (ISA) was that it might serve as the basis for the permanent Transco curtailment plan. Before the FPC, PGW chiefly objected to the "language" of the FPC in approving the ISA and to the alleged effect of discouraging customers from self-help measures.[2] This claim of a prospective disincentive effect is mooted by the permanent Transco curtailment plan adopted by the FPC in Order 778 (Oct. 8, 1976), modified in part on rehearing, Order 778–A (Dec. 8, 1976), which has the full support of PGW.

■ 2. The FPC had the testimony of Transco's Mr. Mullendore that the ISA would best protect the highest priority class of customers from curtailment. The FPC's authority to develop curtailment plans was gleaned from broad statutory concepts of powers to avoid unreasonable preferences.[3] We have previously acknowledged that the Commission has unusually wide latitude in developing approaches to the novel curtailment problem, and in experimenting with interim measures to deal with the necessity of curtailment of natural gas supply. *Consolidated Edison Co. of New York v. FPC,* 167 U.S.App.D.C. 134, 141, 511 F.2d 372, 379 (1974). In *Con Ed I,* we took note of the fact of near-unanimous agreement on the curtailment plan, *id.* 167 U.S.App.D.C. at 143, 511 F.2d at 381. The same situation (as to the parts of the ISA to which PGW objects) pertains here—agreement by all the other Transco customers, including some other customers with access to more expensive supplemental supplies.

■ The fact that ultimately the Commission adopted a permanent plan that was different from the ISA for 1975–76 does not undercut the validity of the interim plan.[4] The agency's latitude to experiment signifies the possibility that the experimental plan might not be successful or even equitable for the long pull. The law does not ensure against such "mistakes," so long as the agency remains open to reassess its experience and make improvements and changes as indicated.

The breadth of system and agency latitude is underscored by the changing nature of Transco's supply and curtailment problem. Transco's first plan emerged in 1971. Its curtailment problem became more difficult in 1972. In 1973, the Commission's Order No. 467–B[5] contained a preference for end-use curtailment. For the 1973–4

1. Order Accepting and Approving Settlement at 2–6 (Nov. 28, 1975), J.A. 138–142. *See also* Order on Rehearing (Feb. 23, 1976), J.A. 184.

2. If PGW is correct about the Commission's desires to permit customers to acquire self-help without fear of losing it, notwithstanding the language in the instant order, the Commission should, at a minimum, appropriately modify the language in the instant order approving the mandatory appropriation of flexible customers' supplemental supplies.
Application of PGW for Rehearing at 6 (Dec. 29, 1975), J.A. 172.

3. Since curtailment programs fall within the FPC's responsibilities under the head of its "transportation" jurisdiction, the Commission must possess broad powers to devise effective means to meet these responsibilities. FPC and

other agencies created to protect the public interest must be free, "within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances." *FPC v. National Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942).
*FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 642, 92 S.Ct. 1827, 1839, 32 L.Ed.2d 369 (1972).

4. *See United States v. CAB,* 167 U.S.App.D.C. 313, 324, 511 F.2d 1315, 1326 (1975) (fuel-saving capacity reduction agreement order upheld as emergency action, but invalid thereafter when not factually reevaluated on nonemergency basis).

5. 49 FPC 583 (1973).

year, the Commission rejected the plan initially proposed by Transco, and approved an end-use plan. This court remanded, sending the system back to continuation of the 1972–3 plan.[6] For 1974–5 there was a hybrid plan. The ISA for 1975–6 won approval of Transco's customers (except PGW) as an approach most likely to provide equitable allocation for high-priority uses.

PGW says that somewhere along the line the Commission's leeway must come to an end. If the 1975–6 year had been cold, it continues, the plan could have been disastrous. Perhaps so, but we must take the situation as we find it, and seek to render a judgment that serves the interest of justice.

3. Even assuming there was error in the Commission's approval of the ISA, there is no pending claim for future relief. PGW has obtained prospective relief it seeks under Order 778. There remains the possibility that this order may itself be vacated on the appeal taken by others. As to that, PGW may intervene in that appeal of the Commission's order, if it be so advised. As matters now stand, there is no outstanding order giving rise to a claim by PGW of prospective relief.

4. PGW contends that it is entitled to restitution for the injury it suffered during the 11½ months the ISA was in effect.[7] That was not the central thrust of its presentation to the Commission, where it was concerned primarily with the future. Its petition for rehearing did not seek a mechanism either for supplemental gas or for compensation.

■ "Restitution is essentially an equitable remedy." *Democratic Central Committee v. Washington Metropolitan Area Transit Commission*, 158 U.S.App.D.C. 7, 46, 485 F.2d 786, 825 (1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974). In *Washington Metropolitan Transit* we ordered restitution of less than the full amount of the invalid fare increase. In *Thompson v. Washington*, 179 U.S.App.D.C. 357, 361, 551 F.2d 1316, 1320 (1977), we found that the equities were such that the remedy for illegal rent increases should be entirely prospective, with no restitution at all. Thus, even if we were to agree with PGW's grievance in its treatment in 1975–76, we would have to consider whether it would be in the public interest to award it money from Transco or extra gas at the expense of its fellow customers.

5. In considering the overall situation, we must take into account that PGW has not presented a clear and definite base for any claim of restitution. What PGW seeks is a remand so that the Commission may determine appropriate restitution—money or extra allocation of gas. It is clear that if restitution were in order, such a determination by the FPC would be required. It would be extremely difficult to allocate the

---

6. Stay order, *Consolidated Edison Co. of New York v. FPC*, No. 73–1999 (D.C.Cir. Nov. 9, 1973). *See Con Ed I, supra*, 167 U.S.App.D.C. at 138, 511 F.2d at 376.

7. Before the FPC, PGW objected to the ISA's provision for pricing of the expensive "emergency" gas obtained by Transco and provided to its customers. The ISA provided that the emergency gas be paid for: 50% on an "incremental" basis, *i. e.*, paid entirely by the Transco customer receiving the emergency gas, and 50% "rolled-in," *i. e.*, spread over Transco's total gas costs and paid by all Transco's customers in proportion to their total usage. PGW expected to receive much less than its "share" of the emergency gas, and insisted that a 100% incremental plan was legally mandatory, to avoid unjust discrimination.

It turned out that PGW took about three times the proportion of Transco's emergency

gas for 1975–76 that had been projected. After holding the hearings ordered by the Commission in response to our order of August 18, 1976, *supra*, ¶ 1, the Administrative Law Judge found that PGW had paid only $23,759 more for emergency gas under the ISA than it would have under a 100% incremental scheme. ALJ Report at 4 (Sept. 29, 1976), J.A. 253, adopted by the FPC by order on Nov. 12, 1976, J.A. 255.

PGW's objection to the ISA's emergency gas pricing system was included in its original brief to this court, but was not mentioned in the PGW brief filed subsequent to this court's order of August 18, 1976, asking the parties to file additional papers on the issue of aggrievement. In the context of this industry and in the case of this petitioner who paid Transco some $38 million for gas in 1975–76, $23,000 can fairly be considered de minimis, and not warranting a full-scale analysis of the pricing issue.

supplemental gas used by PGW in 1975–76 between that amount it would have used in any event and that due to its disadvantage in the ISA allocation.[8] To some extent, PGW is not complaining of demonstrable damage during 1975–76, but rather that it might have been crippled if the winter had been severe, and that in any event it has not been able to retain the benefit of its foresight in squirreling some supplemental supplies to help it through a severe winter if one had materialized. But the primary thrust of our second *Con Ed* case was concern that a curtailment plan serve actual needs.[9]

\* \* \*

No single one of the foregoing points is fatal to PGW's petition. In their totality, they persuade us that this is not a case in which this court should either intervene or require further proceedings. There is a substantial question whether there is a sufficient showing of aggrievement. In any event, the ultimate standard for this court is that its judgments shall serve the interest of justice, 28 U.S.C. § 2106. That standard leads us to the conclusion that the orders of the Commission should be

*Affirmed.*

---

8. This task would be complicated by the need to compare the ISA projections for a normal winter against the reality of gas delivery in the mild 1975–76 winter. After the "aggrievement" hearings in September 1976, *supra*, note 7, the Administrative Law Judge found that:

the PGW witness testified that where PGW had provided for 208,260 Mcf of manufactured gas and 582,061 of LNG [liquefied natural gas], both of these gases are part of PGW's mix in a normal winter; and that the supplemental volumes were "[n]ot solely" provided to make up for anticipated shortfalls from Transco.
ALJ Report, *supra* note 7, at 4, J.A. 253.

9. *Consolidated Edison Co. of New York v. FPC*, 168 U.S.App.D.C. 92, 103, 512 F.2d 1332, 1343 (1975).